139 N.J. Super. 578 (1976)
354 A.2d 685
ONFRIO RUVOLO AND GUISEPPA RUVOLO, PLAINTIFFS,
v.
UNITED STATES STEEL CORPORATION AND UNITED STATES STEEL SUPPLY COMPANY, DEFENDANTS AND THIRD-PARTY PLAINTIFFS,
v.
SUPERMARKETS GENERAL CORPORATION, THIRD-PARTY DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided January 12, 1976.
*580 Mr. Mark Baumgarten for plaintiffs (Messrs. Shevick, Ravich, Koster & Baumgarten, attorneys).
Mr. Burtis W. Horner for United States Steel Corporation and United States Steel Supply Company (Messrs. Stryker, Tams & Dill, attorneys).
Mr. George J. Kenney for Supermarkets General Corporation (Messrs. McElroy, Connell, Foley & Geiser, attorneys).
BRODY, J.J.D.R.C., Temporarily Assigned.
Plaintiff Onfrio Ruvolo was injured in the course of his employment when a wire he was tying around a carton snapped and entered his eye. He was tying cartons with the aid of a machine that tightened, knotted and cut the wire after he manually draped it around the carton. The accident occurred because the machine tightened the wire beyond its tensile strength.
Defendant and third-party plaintiff United States Steel Corporation (Steel) had manufactured the machine and leased it to plaintiff's employer, third-party defendant *581 Supermarkets General Corporation (Supermarkets). The liability issues were tried to a jury which rendered a special verdict. At hand is the task of molding a judgment within the law of the case established in an opinion reported at 133 N.J. Super. 362 wherein the third-party claim for indemnification was preserved from summary dismissal. Supermarkets, now armed with the special verdict, renews its argument that the third-party action is barred by provisions of the Workmen's Compensation Act. N.J.S.A. 34:15-8.
I find the following facts, determined in critical part by the jury's answers to written questions. R. 4:39-1. Supermarkets leased the machine under an oral agreement with Steel and used it to tie cartons of meat and meat trimmings at its Woodbridge food distribution center supplying Path-mark retail stores in the area. The agreement had no provision allocating responsibility in the event the machine caused an accident.
When the machine arrived in Woodbridge a representative of Steel explained its operation to Supermarkets' management personnel. This included an adequate warning that because of the wire-snapping hazard, employees should operate the machine only while wearing safety glasses. An explanation of the operation of the machine is necessary to understand the hazard.
The machine is fitted beneath the top of a table, under the side which the operator faces. To his left is a small, powerful vise-like gripper; to his right another gripper. Between the grippers, in line with them and just under a tongue-shaped projection of the table top, is a horizontal slot containing the operative part of the tying device. The operator positions a carton before him on the table so that the tongue is under the carton where the wire is to be knotted. He unreels a length of wire from a spool on the floor to his left, threads the wire through the left open gripper, slips it sideways into the slot under the tongue, pulls it around the carton in a counter-clockwise direction, reinserts it in the slot and threads it through the right open gripper. The carton *582 and tongue are now loosely encircled by the wire. Steadying the carton with his left hand, the operator activates the machine by depressing a lever with his right hand. The grippers clamp the wire. The right gripper moves to the right thereby tightening the wire around the carton and tongue. The tying device then twists the two strands of wire in the slot into a knot and cuts the wire, freeing the now tied carton which the operator removes from the table by pulling it toward him off the tongue. Upon the lever's being depressed, the machine performs the entire operation in an almost instantaneous burst.
The wire-snapping hazard is caused by the right gripper's moving forcefully a fixed distance to the right without regard to the wire's resistance. Thus, if the operator leaves too little slack in draping the wire around the carton, the gripper may pull the wire so tight as to snap it.
An operator's eye is uniquely vulnerable to serious injury from a wire flailing after a snap. Given the adequate warning as found by the jury, Supermarkets was negligent in failing to issue safety glasses to the plaintiff. The jury absolved Steel from negligence in the design of the machine and rejected as unfeasible plaintiff's only claim of defect: failure to install an awkward plastic shield and telescoping mechanical arm (to steady the carton during the tie) that would have to be manually positioned each time the machine is activated. The jury found, however, that a proximate cause of the accident was Steel's negligent failure to attach to the machine a suitable notice warning the operator of the necessity to wear safety glasses. I dismissed the defense of contributory negligence as legally unavailable because of the manufacturer's duty to guard against injury caused by the operator's reasonably foreseeable negligence. Bexiga v. Havir Mfg. Corp., 60 N.J. 402, 412 (1972).
In sum, the accident was proximately caused by both the negligent failure of Steel to warn plaintiff with a suitable notice on its machine of the necessity to wear safety glasses and the negligent failure of plaintiff's employer, Supermarkets, *583 to heed such warning which Steel had orally given its supervisory personnel before the accident. The legal principles set forth in the motion judge's opinion require entering judgment for Supermarkets.
An employer is liable, regardless of fault, for workmen's compensation benefits whenever an employee is injured or killed on the job. In return, the act immunizes the employer in such cases from tort liability. Contribution under the Joint Tortfeasor's Contribution Act is not available to a third-party tortfeasor against an employer tortfeasor because that act exacts contribution only from those liable in tort to the injured party. Thus, where an injury is proximately caused by the negligence of both an employer and a third-party, only the third-party stands the loss, the employer being subrogated under the act as to any compensation award.[1]
A third party may, however, expressly contract with an employer to produce a different result, even if by such an agreement the entire tort liability loss falls on the employer. Courts at times have found an implied indemnification provision of this sort where there is a contractual or "special legal" relationship between the third party and the employer, and in terms thereof the participation of each in causing the accident is so disproportionate that the employer is seen as solely blameworthy and the third party as blameless although "technically", "vicariously," "secondarily" or "passively" liable. Under these circumstances courts have held that the blameworthy employer impliedly agreed to fully indemnify the third party who, despite his blamelessness is held liable to the injured employee.
*584 The motion judge developed this analysis with appropriate authority and determined that the lessor-lessee relationship between Steel and Supermarkets satisfied the contractual or "special legal" relationship requirement of the rule. He also determined that, depending upon resolution of the factual issues,[2] Supermarkets may be found "solely negligent" and Steel found strictly liable in tort though blameless; thus Steel might be entitled to indemnification. For these reasons, Supermarkets' motion was denied.
At trial, Supermarkets was not found solely negligent. Steel, found liable because of its independent negligence, may not therefore claim the benefit due a blameless third party of an implied indemnification undertaking by Supermarkets. An agreement to indemnify an indemnitee against his own negligence must be intended and clearly expressed. Rommell v. U.S. Steel Corp., 66 N.J. Super. 30, 43 (App. Div. 1961).
Steel claims it is blameless nonetheless. It argues that its liability for negligently failing to attach a safety-glasses warning to the machine is tantamount to finding the machine defective for lacking a guard. This, coupled with the jury's special finding that the machine was not negligently designed, leads Steel to conclude that its liability, though couched in negligence, is in fact based on strict tort liability.
The Supreme Court, however, has placed the failure to attach a suitable warning on a machine in the negligence framework rather than in strict tort liability. Bexiga v. Havir Mfg. Corp., supra 60 N.J. at 411. Furthermore, even if I were free to place the issue in the strict liability framework, I would still not consider the manufacture of a defective product a blameless act. The concept of strict tort liability renders liable to an injured party anyone who has had a hand in putting a defective and dangerous product *585 into the stream of commerce; this includes the blameless retailer innocently unaware of the defect and the manufacturer who, while not necessarily negligent, was blameworthy in making a defective product. Ultimate liability is shifted to the blameworthy tortfeasor through the device of implied warranty or indemnification. Newmark v. Gimbel's Inc., 54 N.J. 585, 600 (1969).
Illinois assigns blame to the manufacturer of a defective product in a slightly different context. Having no equivalent to our Joint Tortfeasor's Contribution Act, there is generally no contribution among joint tortfeasors. Its courts, however, permit indemnification where a defendant tortfeasor can establish that his own negligence was only "passive," whereas the negligence of a joint tortfeasor was "active." The issue of active-passive negligence is always left to trial.
In Stanfield v. Medalist Industries, Inc., 17 Ill. App.3d 996, 309 N.E.2d 104 (App. Ct. 1974) plaintiff employee claimed to have been injured on the job by defendant manufacturer's allegedly defective machine. The manufacturer filed a third-party complaint against the employer, demanding indemnity because of allegedly inadequate instruction and supervision. The trial judge denied the employer's motion to dismiss, ordering that the issue of active-passive responsibility be determined at trial. The appellate court reversed before trial. It concluded that the manufacturer of a defective product is actively responsible whatever the evidence at trial:
* * * [Strict liability in tort] is based on the consideration of protecting the public from [defective and dangerous] products. In such cases there is no active-passive relationship between the parties upon which the doctrine of indemnity can operate. It appears that the liability in these cases is qualitatively active * * * [at 107; court's emphasis]
Burke v. Sky Climber, Inc., 13 Ill. App.3d 498, 301 N.E. 2d 41 (App. Ct. 1973), is to the same effect, holding:
Sky Climber is the manufacturer and distributor of this product and therefore presumably the one who reaped the profits from its *586 manufacture. Hence, the ultimate liability, if there be one because of a defective or unreasonably dangerous condition of the product when it left the manufacturer's possession, should rest upon Sky-Climber as the creator of the product. [at 46]
Our Supreme Court underscored the same policy in refusing to adopt Restatement, Torts 2d, § 402A(1)(b)[3] insofar as it may absolve a manufacturer of liability where he may expect an employer to provide safety devices:
* * * Where a manufacturer places into the channels of trade a finished product which can be put to use and which should be provided with safety devices because without such it creates an unreasonable risk of harm, and where such safety devices can feasibly be installed by the manufacturer, the fact that he expects that someone else will install such devices should not immunize him. The public interest in assuring that safety devices are installed demands more from the manufacturer than to permit him to leave such a critical phase of his manufacturing process to the haphazard conduct of the ultimate purchaser. The only way to be certain that such devices will be installed on all machines  which clearly the public interest requires  is to place the duty on the manufacturer where it is feasible for him to do so. [Bexiga, supra 60 N.J. at 410]
While operation of the Workmen's Compensation Act casts the entire burden of the loss on the manufacturer, application of the equitable principle of indemnification casts the entire burden on the employer. Given this choice, only the former result is consistent with both the intent of the Workmen's Compensation Act and the general policy considerations underlying strict tort liability in the factual setting of this type of case.
*587 Must we be limited to this choice of extremes? In its last point Steel urges adoption of a middle ground developed in Dole v. Dow Chemical Co., 30 N.Y.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288 (Ct. App. 1972). There the court reasoned that the search for a blameless third party is self-deceptive. When courts speak of the third party's liability to the employees as "technical," "vicarious," "secondary" or "passive" they are simply saying its blame is slight and should not count in adjusting the loss between the tortfeasors. Since in all cases there is a weighing of degrees of blame, albeit unacknowledged, the court concluded that the equitable response should be partial indemnification (i.e., contribution), with the trier of fact making the apportionment based on degrees of fault.
I declined to submit this question to the jury despite the seductive reasoning of the Dole case. In light of New Jersey law I see no basis for judicially compelling an employer, deemed immune by the Workmen's Compensation Act, to any form of contribution. Admittedly, full indemnification or none is a choice of extremes. But this merely reflects judicial deference to the employer's immunity under the act, to be disturbed only where equitable considerations are compelling in the extreme. On a state of facts virtually the same as those in Dole, the Court of Appeals for the Third Circuit, applying New Jersey law, dismissed the manufacturer's third-party claim against the employer. Bertone v. Turco Products, 252 F.2d 726 (1958).
Partial judgment will be entered for the plaintiffs on liability, and for third-party defendant Supermarkets General Corporation.
NOTES
[1] The seeming inequity of this result has prompted courts in a small minority of other jurisdictions to interpret similar statutory provisions so that a negligent employer stands at least some of the loss. See discussion of the minority and majority rules in Schweizer v. Elox, 133 N.J. Super. 297 (Law Div. 1975), and 2 Larson, Workmen's Compensation, §§ 76.21 and 76.22.
[2] It should be noted that the factual basis of liability was not adequately presented to the judge, plaintiff not having actively participated in the motion.
[3] Restatement, Torts 2d, § 402A (1965):

One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.